**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HASHONA CLARK, | : | |
| | : | Civil Action No. 08-3347 (RBK) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MICHELLE RICCI, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>          Counsel for Respondents
Hashona Clark                Jack J. Lipari
New Jersey State Prison      Ofc. of Atl. Co. Prosecutor
P.O. Box 861                 4997 Unami Boulevard
Trenton, NJ 08625            P.O. Box 2002
                             Mays Landing, NJ 08330

**KUGLER**, District Judge

　　Petitioner Hashona Clark, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are Warden Michelle Ricci and the Attorney General of New Jersey.

　　For the reasons stated herein, the Petition must be dismissed with prejudice as time-barred.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

On January 30, 1990, John Egan, an employee of Harry's gold Exchange, was shot and killed in the course of a robbery.  Evidence at the scene indicated that Egan was disabled by the first two or three shots and fell face down behind the counter.  The killer then moved behind the counter and fired two more shots, one piercing the victim's head and the other his upper back.

Geraldine Jackson testified that she obtained the gun used to kill Egan from a drunken Pleasantville police officer with whom she had a relationship.  In a roundabout fashion, she gave the gun to defendant's brother, Raymond Clark.  She ten overheard defendant and Raymond discuss committing a robbery.  Jackson claimed that she did not actually participate in the robbery.

However, defendant, in his confession, asserted that Jackson accompanied him and his brother to Harry's Gold Exchange and served as the "lookout."  After entering the store, Raymond shot and killed the clerk. Both brothers then loaded the jewelry into a backpack and their pockets.  Upon exiting the store, the brothers joined Jackson and the group proceeded to a nearby bus stop.  On the way, defendant and Raymond removed the jewelry from the display cases which they discarded on the street.  The three then boarded a bus and returned to Pleasantville.  The police later found the discarded display cases strewn about the streets

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

from the jewelry store to the bus stop, thus confirming defendant's account.

After returning to Pleasantville, the three divided the jewelry.  Defendant subsequently attempted to sell the murder weapon.  His friend, James Davis, agreed to assist him and contacted his cousin, Nick Briggs.  Brigs and defendant could not agree upon a price.  For a fee, however, Briggs agreed to alter the weapon so that it could not be traced by ballistics tests.  Although Briggs attempted to destroy the gun's ballistics characteristics, his efforts proved unsuccessful.  Upon learning that the weapon had been used in a shooting, Briggs discarded it in the parking lot of the pleasantville Police Department.  The gun was eventually recovered.  Ballistics tests indicated that the weapon had been used in the robbery of Harry's gold Exchange and the shooting of Egan.  Unaware of these developments, defendant gave "a couple" of the stolen rings to Briggs in lieu of the fee that had been promised.

Suspecting that the investigation would ultimately focus on him, defendant made several attempts to flee. Initially, he contacted a friend, Douglas Edwards, and asked for his assistance.  According to Edwards, defendant was wearing rings on all his fingers and showed him other items of jewelry.  Edwards contacted a friend, Danny Stalworth, who agreed to help.  Defendant later met Stalworth at his house and told him that he had robbed a jewelry store, but no one was hurt.

While defendant was in the house, Stalworth received a telephone call from Sergeant Ernest Jubilee, a member of the Atlantic County Prosecutor's Office. Apparently, Jubilee had received information that defendant, Raymond and Jackson were "giving away" the stolen jewelry in Pleasantville.  Jubilee informed Stalworth about the robbery and later confirmed that a man had been killed.  At that point, Stalworth ushered defendant out of his house.  Stalworth later gave Jubilee several articles of jewelry that defendant had given him.  Stalworth told Jubilee that defendant had been at his house.

Jubilee subsequently recovered some of the stolen jewelry price tags from Jackson's bedroom at her mother's house.  Jackson's mother had consented to the

search.  The police also recovered stolen items of jewelry from others who had received them from defendant, Raymond and Jackson.

Following discussions with Briggs, the police ultimately were able to locate defendant at Davis's girlfriend's house.  Defendant voluntarily accompanied the officers to the Atlantic County Prosecutor's Office, where he was advised of his constitutional rights.  Defendant told Sergeant Jubilee that Raymond and Jackson were responsible for the crimes.  He claimed that Jackson had stolen a police officer's gun on the night before the robbery, and that Raymond told him that he intended to rob a drug dealer in Pleasantville.  According to defendant, he met Raymond the next day and was told that the robbery attempt was unsuccessful.  That afternoon, Raymond and Jackson travelled to Atlantic City.  Defendant said that Raymond had the gun.  Defendant asserted that he later met his brother and was told that he had "d[one] a job."  Defendant claimed that he attempted to sell the gun to Briggs but upon learning that it had been used in a crime, Briggs threw it onto the Pleasantville Police Department parking lot.  Defendant further asserted that he was in school when the robbery and shooting were committed.  However, the police later learned that defendant was not present at the school as he had claimed.

Defendant was then formally arrested and charged with tampering with physical evidence, receiving stolen property and illegal transfer of a firearm.  He was transported to the Pleasantville Police Department where he was fingerprinted and kept overnight.  Investigator Leslie Folks of the Atlantic County Prosecutor's Office was informed that Detective Hamilton of the Atlantic City Police Department had matched defendant's left palm print with a print recovered from the jewelry store.

Defendant was then taken to the Atlantic County Prosecutor's Office where he was again apprised of his constitutional rights.  Defendant initially denied participating in the robbery.  When confronted with the fact that his palm print had been found at the jewelry store, defendant admitted that he had assisted his brother in the robbery.  Defendant then gave a taped confession admitting his complicity.  Defendant

4

continued to claim, however, that Raymond fired the
fatal shots.  Jackson and Raymond were subsequently
arrested at a motel in Richmond, Virginia.  Items of
stolen jewelry were found in their clothing and strewn
about the motel room.

(Opinion of Superior Court of New Jersey, Appellate Division, at

3-7 (March 11, 1994).)

B.    Procedural History

Tried to a jury, Petitioner was found guilty of conspiracy

to commit armed robbery, N.J.S.A. 2C:5-2; N.J.S.A. 2C:15-1, armed

robbery, N.J.S.A. 2C:15-1, felony murder, N.J.S.A. 2C:11-3a(3),

purposeful or knowing murder, N.J.S.A. 2C;11-3a(1) and (2),

possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-

4a, possession of a handgun without a permit, N.J.S.A. 2C:39-5b,

and tampering with physical evidence, N.J.S.A. 2C:28-6(1).

The trial court sentenced Petitioner to life imprisonment,

with a 30-year parole disqualifier, and a consecutive 18-month

term.  The judgment of conviction was entered on February 22,

1991.

The Superior Court of New Jersey, Appellate Division,

affirmed the conviction and sentence in an unpublished opinion on

March 11, 1994.[2]  The Supreme Court of New Jersey denied

_____

[2] On direct appeal, Petitioner argued that (1) the trial
court erred by failing to exclude his taped confession and palm
prints taken in the course of his interrogation, (2) law
enforcement officers violated his right to due process by
destroying their notes, (3) the trial court's instructions were
erroneous in various particulars, (4) the trial court erred by
failing to merge his armed robbery conviction into the felony

certification on May 26, 1994.  <u>State v. Clark</u>, 137 N.J. 166 (1994).

On December 20, 1995, Petitioner filed, in the trial court, a petition for post-conviction relief ("PCR").  The only issue raised in Petitioner's pro se petition was a claim of "Ineffective Counsel" without further elaboration.  No further brief was filed by Petitioner's PCR counsel.  At the hearing, Petitioner's PCR counsel represented to the trial court that Petitioner was satisfied with trial counsel's performance and that he was only seeking a reduction in sentence.  The trial court denied relief on April 28, 1997.  Petitioner filed a notice of appeal more than two years later, on June 21, 1999.  However, the appeal was withdrawn and ultimately dismissed on October 1, 1999.  Again, more than two years later, on May 20, 2002, Petitioner moved in the Appellate Division to reinstate the PCR appeal.  On June 17, 2002, the Appellate Division reinstated the PCR appeal.  Petitioner then moved for a summary disposition, contending that his first PCR counsel had not provided effective assistance, and requested an opportunity to file a new petition for post-conviction relief.  On February 24, 2003, the Appellate Division granted the requested summary disposition.

---

murder count, and (5) the sentences imposed were manifestly excessive.

On May 15, 2003, Petitioner filed a new PCR petition.
Petitioner asserted that he had been deprived of effective
assistance of trial counsel.[3]  Following a hearing, the trial
court denied relief on November 12, 2003.  On October 3, 2005,
the Appellate Division affirmed the denial of relief, in part,
and remanded for an evidentiary hearing on certain claims.[4]  The
State's petition for certification was denied on January 17,
2006.  At the evidentiary hearing, Petitioner abandoned certain
issues,[5] leaving only the issues of counsel's failure to call
certain eyewitnesses and counsel's failure to seek credibility
instructions regarding Petitioner's statements and the testimony
of his accomplices.  The trial court again denied relief on
August 31, 2006.  The Appellate Division affirmed on December 21,
2007.  <u>State v. Clark</u>, 2007 WL 446062 (N.J. Super. App. Div. Dec.

---

[3] Specifically, Petitioner argued that his trial counsel had
been ineffective because he failed (1) to call two eyewitnesses
for identification purposes, (2) to call alibi witnesses, (3) to
adequately challenge the State's fingerprint expert, (4) to
consult a psychological expert concerning what he characterized
as the State's coercive interrogation techniques, (5) to request
a charge on certain lesser included offenses, (6) to advise
Petitioner of a plea offer, (7) to request a jury charge on the
credibility of both defendant's confession and the testimony of
defendant's accomplices, and (8) to object to certain remarks in
the prosecutor's summation.

[4] The Appellate Division remanded for an evidentiary hearing
on claims (1), (2), (3), (6), and (7), listed in Note 3, above.

[5] At the hearing, Petitioner abandoned issues (2), (3), and
(6), listed in Note 3, above.

12, 2007).  The Supreme Court denied certification on May 6, 2008.

This Petition, dated June 6, 2008, followed.[6]  Respondents have answered that the Petition should be dismissed as time-barred or, in the alternative, denied on the merits.  Petitioner has replied, asserting inter alia that he is entitled to equitable tolling.  This matter is now ready for disposition.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

---

[6] Here, Petitioner asserts the following claims: (1) trial counsel failed to provide constitutionally effective assistance because (a) he failed to move to suppress Petitioner's initial statement to Investigator Jubilee and evidence obtained as a result of that statement, (b) he failed to argue to Investigator Leslie Folks failed to "scrupulously honor" Petitioner's right to remain silent, (c) he failed to argue that Petitioner was illegally arrested, (d) he failed to investigate an eyewitness regarding identification of Petitioner, (e) he failed to request jury instructions regarding the credibility of Petitioner's custodial statements and the testimony of the accomplices, and (2) Petitioner was deprived of due process of law by the investigating officers' destruction of their notes.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context

where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent."  Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v.

Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### III.  ANALYSIS

Respondents contend that the Petition is untimely. Specifically, Respondents argue that the Appellate Division's allowance of a late PCR appeal, or reinstatement of a previously-dismissed PCR appeal, does not retroactively render Petitioner's state application for post-conviction relief "pending" from the

periods between (1) April 28, 1997, when the PCR was denied, and June 21, 1999, when Petitioner filed a late notice of appeal, and (2) October 1, 1999, when the PCR appeal was dismissed, and May 20, 2002, when Petitioner moved to reinstate the appeal.  Thus, Respondents contend that the federal one-year limitations period expired during those two-year periods of PCR appeal inactivity, and that it cannot be resurrected by subsequent events.

Petitioner argues that he is entitled to equitable tolling, because his PCR counsel failed to timely file an appeal or correspond with Petitioner.  Petitioner also contends that the State has "waived" any objection to his untimely filings.

The limitation period for a § 2254 habeas petition is set forth in 28 U.S.C. § 2244(d),[7] which provides in pertinent part:

> (1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

---

[7] The limitations period is applied on a claim-by-claim basis.  See Fielder v. Verner, 379 F.3d 113 (3d Cir. 2004), cert. denied, 543 U.S. 1067 (2005); Sweger v. Chesney, 294 F.3d 506 (3d Cir. 2002).  The only starting-date provision applicable here is § 2244(d)(1)(A), the date on which the judgment became final by the conclusion of direct review.

(c) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(d) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

Thus, evaluation of the timeliness of a § 2254 petition requires a determination of, first, when the pertinent judgment became "final," and, second, the period of time during which an application for state post-conviction relief was "properly filed" and "pending."

A state-court criminal judgment becomes "final" within the meaning of § 2244(d)(1) by the conclusion of direct review or by the expiration of time for seeking such review, including the 90-day period for filing a petition for writ of certiorari in the United States Supreme Court.  See Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir. 1999); U.S. Sup. Ct. R. 13.

Where a conviction became final prior to April 24, 1996, the effective date of § 2244(d), a state prisoner has a one-year grace period after that effective date to file a § 2254 petition,

barring some other basis for statutory or equitable tolling.

Burns v. Morton, 134 F.3d 109, 111 (3d Cir. 1998).

To statutorily toll the limitations period, a state petition for post-conviction relief must be "properly filed."

> An application is "filed," as that term is commonly understood, when it is delivered to, and accepted by the appropriate court officer for placement into the official record.  And an application is "properly filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings.  These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.  In some jurisdictions the filing requirements also include, for example, preconditions imposed on particular abusive filers, or on all filers generally.  But in common usage, the question whether an application has been "properly filed" is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar.

Artuz v. Bennett, 531 U.S. 4, 8-9 (2000) (citations and footnote omitted) (finding that a petition was not "[im]properly filed" merely because it presented claims that were procedurally barred under New York law on the grounds that they were previously determined on the merits upon an appeal from the judgment of conviction or that they could have been raised on direct appeal but were not).

Where a state court has rejected a petition for post-conviction relief as untimely, however, it was not "properly filed" and the petitioner is not entitled to statutory tolling under § 2244(d)(2).  Pace v. Diguglielmo, 544 U.S. 408 (2005).

This is so even where, in the alternative, the state court addresses the merits of the petition in addition to finding it untimely.  Carey v. Saffold, 536 U.S. 214, 225-26 (2002).

An application for state post-conviction relief is considered "pending" within the meaning of § 2244(d)(2), and the limitations period is statutorily tolled from the time it is "properly filed," during the period between a lower state court's decision and the filing of a notice of appeal to a higher court, Carey v. Saffold, 536 U.S. 214 (2002), and through the time in which an appeal could be filed, even if the appeal is never filed, Swartz v. Meyers, 204 F.3d at 420-24.  More specifically, "The time that an application for state post conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law." Evans v. Chavis, 546 U.S. 189, 191 (2006) (finding that time between denial of post-conviction relief and filing of appeal was not tolled where appeal was untimely, even where state considered untimely appeal on its merits).  However, "the time during which a state prisoner may file a petition for writ of certiorari in the United States Supreme Court from the denial of his state post-conviction petition does not toll the one year statute of limitations under 28 U.S.C. § 2244(d)(2)."  Stokes v. District Attorney of the

County of Philadelphia, 247 F.3d 539, 542 (3d Cir.), cert.
denied, 534 U.S. 959 (2001).

The limitations period of § 2244(d) also is subject to
equitable tolling.  Fahy v. Horn, 240 F.3d 239, 244 (3d Cir.),
cert. denied, 534 U.S. 944 (2001); Jones v. Morton, 195 F.3d 153,
159 (3d Cir. 1999); Miller v. New Jersey State Dept. of
Corrections, 145 F.3d 616, 618 (3d Cir. 1998).  Equitable tolling
applies

> only when the principles of equity would make the rigid
> application of a limitation period unfair.  Generally,
> this will occur when the petitioner has in some
> extraordinary way been prevented from asserting his or
> her rights.  The petitioner must show that he or she
> exercised reasonable diligence in investigating and
> bringing the claims.  Mere excusable neglect is not
> sufficient.

Miller, 145 F.3d at 618-19 (citations and punctuation marks
omitted).  Among other circumstances, the Court of Appeals for
the Third Circuit has held that equitable tolling may be
appropriate "if the plaintiff has timely asserted his rights
mistakenly in the wrong forum," i.e., if a petitioner has filed a
timely but unexhausted federal habeas petition.  Jones, 195 F.3d
at 159.  See also Duncan v. Walker, 533 U.S. 167, 183 (2001)
(Stevens, J., joined by Souter, J., concurring in part) ("neither
the Court's narrow holding [that the limitations period is not
statutorily tolled during the pendency of a premature federal
habeas petition], nor anything in the text or legislative history
of AEDPA, precludes a federal court from deeming the limitations

16

period tolled for such a petition as a matter of equity"); 533 U.S. at 192 (Breyer, J., dissenting, joined by Ginsburg, J.) (characterizing Justice Stevens's suggestion as "sound").

Finally, "a pro se prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court." Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (citing Houston v. Lack, 487 U.S. 266 (1988)).

Here, Petitioner's conviction became final on August 24, 1994, ninety days after the Supreme Court of New Jersey denied certification on May 26, 1994, and before the effective date of the AEDPA.  On the effective date of the AEDPA, April 24, 1996, Petitioner's first PCR was pending in the trial court.  The trial court denied relief on April 28, 1997, and the federal limitations period began to run 45 days later,[8] on June 12, 1997. Petitioner was required to file his federal habeas petition by June 12, 1998, barring any grounds for federal statutory or equitable tolling.

Petitioner, through counsel at the Office of the Public Defender, filed a late notice of appeal in the state PCR proceeding on June 21, 1999, more than two years after the denial of PCR relief in the trial court, and after the federal

---

[8] Under New Jersey law, Petitioner was required to file a notice of appeal within 45 days after entry of judgment in the trial court.  N.J.Ct.R. Rule 2:4-1(a).

limitations period had expired.[9]  Shortly thereafter, on August
25, 1999, following a review of Petitioner's file, a supervising
attorney with the Appellate Section of the Office of the Public
Defender, Matthew Astore, Esq., sent Petitioner a letter advising
him that a review of the file reflected "that there is nothing
for us to appeal" and further advising Petitioner that if he did
not hear from Petitioner by September 16, 1999, he would assume
that Petitioner agreed with him and he would withdraw the appeal.
On September 30, 1999, Petitioner's counsel filed a Notice of
Withdrawal and on October 1, 1999, the Appellate Division issued
an Order of Dismissal.  On October 4, 2009, Petitioner sent Mr.
Astore, a letter asking him not to withdraw the appeal.
Petitioner's traverse also includes a letter from Mr. Astore,
dated October 20, 1999, reiterating that there was no basis for
appeal of the denial of relief in 1997, and that if Petitioner
wished to raise further issues he must raise them in a new PCR
petition.  (Traverse, Ex. at PA576 - PA587.)

   Also attached to Petitioner's Traverse is a letter to the
Clerk's Office at the Appellate Division, dated June 1, 2001, in

---

[9] In a letter to the public defender dated March 16, 1999,
Petitioner indicates that his PCR counsel told him in 1997 that
there was no basis for appeal and that Petitioner "was not aware
that I could have appealed the decision myself until recently."
He repeats this explanation in a letter dated April 8, 1999.
Thus, it appears that Petitioner was aware in 1997 that his
counsel did not intend to file a notice of appeal from the denial
of PCR relief.  (Traverse, Ex. at PA576-PA578.)

which he asks the status of his appeal and states that he has received no correspondence regarding his appeal since July 6, 1999, when he received a standard informative letter that counsel would be in contact with him soon.  Thereafter, on July 23, 2001, Petitioner again wrote to the Clerk of the Appellate Division, in response to a letter not attached to the Traverse, stating the following:

> First of all, as stated previously, this is the first time I have heard anything about this.  I am hereby stating, addressing, asserting, and declaring that I never requested that the appeal be withdrawn, as it is purported on the ORDER FOR DISMISSAL.  Furthermore, I was never assigned counsel on this matter, so how could I request of counsel to put in a NOTICE OF WITHDRAWAL, which is signed by a one Matthew Astore, Deputy Public Defender II, someone I have neither ever heard of nor communicated with.  So, how was this "request for withdrawal" supposedly made by me?  Not by letter-form; I am in possession of every written communication from the Appellate Division made to me and eery communication I made to them; no where is there any mention of anything about dropping the appeal, dismissing it, withdrawing from it, or anything of that nature.
>
> In furtherance, the NOTICE OF WITHDRAWAL is stamped "RECEIVED' on September 30, 1999, and the ORDER FOR DISMISSAL is stamped "FILED" on October 1, 1999.  This is a most confusing aspect, because on October 1, 1999 - the same day in which the ORDER was filed - I sent a letter to Joan Van Pelt, which I made mention of a letter that I received from the Appellate Division on July 6, 1999, which informed me that an attorney would be in contact; my letter was to inform her that an attorney had not yet been in contact, as of October 1, 1999 (I was never contacted by anyone after that date either); this is proof and evidence that I had no knowledge that my appeal was, in effect, in the process of being dismissed that same week, supposed, somehow, at my own request.

(Traverse, Ex. at PA590-PA591.)[10]  On August 6, 2001, the Clerk of the Appellate Division responded with instructions that Petitioner could move to reinstate the appeal.[11]  Petitioner did not file a motion to reinstate the appeal until May 20, 2002, and the Appellate Division reinstated the PCR appeal on June 17, 2002.

It is clear that no application for state post-conviction or other collateral relief was "pending" until June 21, 1999, more than a year after the federal limitations period had expired. Nor was any state application for state post-conviction or collateral relief "pending" between October 1, 1999, and May 20, 2002.  The federal limitations period was not tolled during these periods.  See, e.g., Moore v. Crosby, 321 F.3d 1377, 1380 (11th Cir. 2003) ("a state application [for belated appeal, even if granted,] filed after expiration of the [federal] limitations period does not relate back so as to toll idle periods preceding the filing of the federal petition") (also collecting cases); Fernandez v. Sternes, 227 F.3d 977 (7th Cir. 2000) (where state court grants leave to pursue late PCR appeal, the proper period

_____

[10] The letters attached by Petitioner to this Petition reflect that Petitioner did, in fact, correspond with Mr. Astore in 1999 with regard to his PCR appeal.

[11] In addition, by letter dated August 28, 2001, the Office of the Public Defender forwarded to Petitioner copies of his correspondence to and from Matthew Astore in August and October of 1999.

of time to exclude from § 2244(d) limitations period is "all time between the filing of the request to excuse the default and the state court's decision on the merits (if it elects to excuse the default)"); <u>McHoney v. State of South Carolina</u>, 918 F.Supp.2d 700, 705 (D.S.Car. 2007) (adopting the reasoning of the Eleventh Circuit in <u>Moore</u>).   Thus, this Petition is not timely.

This Court is not unmindful of the Supreme Court's recent decision in <u>Jimenez v. Quarterman</u>, 129 S.Ct. 681 (2009), in which the Court undertook to interpret the meaning of the provision in 28 U.S.C. § 2244(d)(1)(A) that defines the starting date of the federal habeas limitations period as "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."   In particular, the question before the Court was whether the date on which direct review became "final" under the statute was the date on which the petitioner's conviction initially appeared final or the date when a judicially-permitted out-of-time appeal became final. There, the Court held that "where a state court grants a criminal defendant the right to file an out-of-time <u>direct appeal</u> during state collateral review, but before the defendant has first sought federal habeas relief, his judgment is not yet 'final' for purposes of § 2244(d)(1)(A)."   129 S.Ct. at 686 (emphasis added).

That "narrow" decision, <u>see</u> 129 S.Ct. at 686, however, does not alter this Court's conclusion that a state court's decision

to allow an out-of-time appeal from the denial of <u>post-conviction</u> <u>relief</u> does not retroactively render a state post-conviction relief proceeding "pending" for purposes of § 2244(d)(2). <u>See</u> <u>DeJesus v. Acevedo</u>, 567 F.3d 941 (7th Cir. 2009); <u>Streu v.</u> <u>Dormire</u>, 557 F.3d 960 (8th Cir. 2009); <u>Drew v. Superintendent</u>, 607 F.Supp.2d 277 (D.Mass. 2009).

Similarly, the suggestion that the State "waived" the timeliness of this <u>federal</u> petition by not opposing a late <u>state</u> PCR appeal, is unavailing. The two issues are not related. Certainly, no action taken by the State in the state PCR appeal could be construed as agreement that a late state PCR appeal should be deemed, for federal habeas purposes, to have been "pending" for years before the State PCR notice of appeal was filed.

Nor has Petitioner established any grounds for equitable tolling. Contrary to his characterizations of events, it is clear from the attachments to his Traverse that he knew in 1997 that his public defender was not going to file an appeal from the denial of PCR relief. Petitioner alleges that he was not aware, until 1999, that he could file a notice of appeal himself. That lack of awareness does not constitute grounds for equitable tolling. Between 1997 and 1999, Petitioner was not, in any "extraordinary" way prevented from filing a notice of appeal. Nor does the record reflect that he exercised reasonable

diligence in bringing his claims.  In mid-1999, he corresponded

with new PCR counsel and he was clearly aware, by October 1,

1999, that PCR counsel intended to move for a dismissal, even if

Petitioner did not immediately receive counsel's final

correspondence with respect to the dismissal.  Nevertheless,

Petitioner failed to pursue the issue, either with PCR counsel or

the Appellate Division, for almost two years, until June 1, 2001.

Although the Clerk of the Appellate Division advised him, in

correspondence dated August 6, 2001, that he could move to

reinstate the appeal, Petitioner waited more than nine months,

until May of 2002, to file such a motion.  The correspondence

associated with Petitioner's PCR appeal reflects that he

repeatedly abandoned the appeal without cause.  Accordingly,

Petitioner has failed to establish any grounds for equitable

tolling.[12]

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or

judge issues a certificate of appealability, an appeal may not be

taken from a final order in a proceeding under 28 U.S.C. § 2254.

A certificate of appealability may issue "only if the applicant

has made a substantial showing of the denial of a constitutional

---

[12] To the extent Petitioner alleges that he is entitled to
equitable tolling because he is "actually innocent" of the
challenged conviction, he has failed to provide any meaningful
evidence in support of that contention.

right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, jurists of reason would not disagree with this Court's procedural ruling.  Accordingly, no certificate of appealability shall issue.

V.  <u>CONCLUSION</u>

For the reasons set forth above, the Petition must be dismissed with prejudice as untimely.  An appropriate order follows.

s/Robert B. Kugler
Robert B. Kugler
United States District Judge

Dated: August 27, 2009